**S.D. WARREN CO., A DIVISION OF SCOTT PAPER COMPANY, Petitioner,**

v.

**UNITED PAPERWORKERS INTERNATIONAL UNION, AFL–CIO LOCAL 1069, Respondent.**

**Civ. No. 85–0321 P.**

United States District Court, D. Maine.

April 2, 1986.

S. Mason Pratt, Elizabeth S. Pearce, Pierce, Atwood, Scribner, Allen, Smith & Lancaster, Portland, Me., for petitioner.

Stephen P. Sunenblick, Sunenblick, Fontaine & Reben, Portland, Me., for respondent.

OPINION

GENE CARTER, District Judge.

INTRODUCTION

In this action, S.D. Warren Company seeks to overturn, and the United Paperworkers Union seeks to enforce, an Arbitrator's decision to reinstate three employees who were discharged by the Company. The employees, Kimberly Denis, Deborah Graham and Linda Willoughby, were discharged in connection with an undercover investigation conducted at the Company, for violation of a rule contained in the Collective Bargaining Agreement prohibiting the possession, use or sale of marijuana on mill property. The Arbitrator sustained the grievances of these employees and directed the Company to reinstate them with full back pay, seniority and benefits but imposed unpaid suspensions of seven

months, nine months and four months, respectively.[1] After reviewing the submissions regarding the Company's Motion to Vacate the Award, the Magistrate issued a Recommended Decision finding that while enforcement of the award did not violate public policy, the Company's Motion should be granted on the basis that the Arbitrator had exceeded her authority. Both parties filed objections to the Recommended Decision, the Union in regard to the Magistrate's determination that the Arbitrator had exceeded her authority, and the Company in regard to the Magistrate's finding that the award did not violate public policy. After reviewing the record, the Court has determined that it must enforce the Arbitrator's award.

### STANDARD OF REVIEW

This matter is not a pretrial motion and it is dispositive of the parties' dispute. Therefore, in reviewing the Magistrate's Recommended Decision this Court must make a *de novo* determination upon the record under 28 U.S.C. § 636(b)(1)(B) and Fed.R.Civ.P. 72(b). *See, e.g., Aluminum Company of America v. United States Environmental Protection Agency*, 663 F.2d 499 (4th Cir.1981).

The standard under which a United States District Court may review an arbitration award is extremely narrow. In accordance with established policy, "[w]here parties to a collective bargaining agreement have provided for arbitration as the final and binding method for settling grievances the arbitration award is normally non-reviewable by a court." *Bettencourt v. Boston Edison Company*, 560 F.2d 1045, 1048 (1st Cir.1977), *citing United Steelworkers v. Enterprise Wheel and Car Corporation*, 363 U.S. 593, 599, 80 S.Ct. 1358, 1362, 4 L.Ed.2d 1424 (1960) (herein *Enterprise Wheel & Car*). *See also* 29 U.S.C. § 173(d); 9 U.S.C. § 10. Therefore, a Court is bound to enforce an arbitral award unless the decision does not "draw its essence from the collective bar-

gaining agreement." *W.R. Grace & Company v. Local Union 759*, 461 U.S. 757, 764, 103 S.Ct. 2177, 2182, 76 L.Ed.2d 298 *citing Enterprise Wheel & Car*, 363 U.S. at 597, 80 S.Ct. at 1361.

In order to overturn an arbitration award, this Court must find, at a minimum, that the decision is "unfounded in reason and fact," "based on reasoning 'so palpably faulty that no judge, or group of judges, could ever conceivably have made such a ruling,'" or "mistakenly based on a crucial assumption which is 'concededly a non-fact.'" *Bettencourt*, 560 F.2d at 1050 (citations omitted). Apart from matters specifically excluded by the parties "all of the questions on which the parties disagree must ... come within the scope of the grievance and arbitration provisions of the collective agreement." *United States v. Warrior & Gulf Navigation Company*, 363 U.S. 574, 581, 80 S.Ct. 1347, 1352, 4 L.Ed.2d 1409 (1960) (herein *Warrior & Gulf*).

### I. Did the Arbitrator Exceed Her Authority Under the Collective Bargaining Agreement?

■ The Collective Bargaining Agreement between the parties sets out a dispute resolution process at Article 12, Section 4. The disputes to be covered by this process are "differences ... as to the meaning or application of the provisions of th[e] Agreement." The Agreement provides that, if such a dispute is not resolved by several levels of internal procedure,

> the matter may be referred by either party to an arbitrator for decision, but it is agreed that the matter thus referred shall be concerned solely with the interpretation on and/or application of th[e] collective bargaining Agreement ... The decision of the arbitrator shall be final and binding on the parties.

The Agreement further states that "the arbitrator shall have no power to render a decision which in any way adds to, sub-

---

**1.** Marshall Buhelt, who was also a grievant in this proceeding, is now deceased. The Arbitra-tor denied his grievance and the Union did not seek to vacate the Arbitrator's decision.

tracts from, or modifies any provision of the Agreement."

The Agreement also includes a "Management Rights" clause which states:

> The Company reserves the sole right to manage the business of the Company and its Cumberland Mills operation and to direct the working force. This right includes but is not limited to ... the right to select, hire, assign, promote, demote, transfer, discipline, suspend or discharge employees for proper cause or to relieve them from duties because of lack of work or for other legitimate reasons.

The Agreement includes an employees' seniority provision stating that mill seniority ends upon "discharge for proper cause." The final provision relevant to this case is Mill Rule 7(a), which is included in Appendix A of the Agreement. It states:

> 7. Causes for Discharge
>
> In any organization, certain rules of conduct must be observed by the members for the good of all.
>
> Violation of prescribed rules are cause for disciplinary action of varying degrees of severity.
>
> Violations of the following rules are considered causes for discharge.
>
> a) Possession, use or sale on Mill property of intoxicants, marijuana, narcotics or other drugs. The possession or use of a specific narcotic or drug properly prescribed by a licensed physician is the only exception to this rule.

The Arbitrator conducted a hearing in this case and found the following facts: In October 1983 Agent Timothy Berry was hired by the Company under name "Al" Berry as an entry-level employee at the mill. Agent Berry was, in fact, acting as an undercover agent for the State Police Drug Unit. That agency reached an arrangement with S.D. Warren, prior to Agent Berry's employment at the mill, that he would make himself available to the Company for any administrative matter resulting from his work at the completion of the investigation. During this undercover operation, Agent Berry kept written reports which were eventually turned over to

the Company and which formed the basis for the termination of twelve employees, including the grievants. The Reports disclosed, and the Arbitrator found to be proved beyond a reasonable doubt, that all three employees violated Mill Rule 7(a).

The Arbitrator found what might be termed "extenuating circumstances" in each of the three grievances she sustained. She found that Linda Willoughby was the first and only female employee out of fifty-two employees in the "winder room," and was under continual pressure from the men to do her work faster. The Award states that, after five years of working under these circumstances Ms. Willoughby was advised by the Company physician to take an extended leave. Upon return, she was diagnosed as suffering from anorexia nervosa and was enrolled in the Company's Employee Assistance Program, designed to assist employees with personal problems. The Arbitrator found that Ms. Willoughby was approached by Agent Berry eight to twelve times in the eight-to-twelve-week period she knew him, and approached an additional four times in her work area on January 30, 1984. Prior to the last approach on January 30th, she was reprimanded by her foreman in regard to Berry's repeated visits during a period of time when Ms. Willoughby was supposed to be working. On the last approach, the Arbitrator found, Willoughby took a bag from her pocket, gave Agent Berry a small amount of marijuana, about enough for one marijuana cigarette, refused payment, and told him to leave her alone. The Company terminated her employment for possession of marijuana. The Arbitrator found credible Ms. Willoughby's testimony that she never used marijuana at work, noting her service on the Safety Committee and that she had previously suffered a work injury.

The Arbitrator found that Kimberly Denis was the only female employee in her area and that, while any coworker could make life difficult for her, she was especially dependent on her truck driver—for a period, Agent Berry—whose work could affect her bonus. The Arbitrator found that,

after being approached three times, Ms. Denis agreed to try to get Agent Berry $20.00 worth of marijuana and to act as a "go-between," finding the marijuana for Berry from another employee at the plant. The Arbitrator stated, "Granted, Ms. Denis was in a vulnerable position. She was a woman half Berry's age working alone in an overwhelmingly male environment. She was in no position to risk alienating him, and she could not avoid him. But she had not exhausted her alternatives ..." Arbitrator's Award (herein "Award") at 33.

The Arbitrator found that Agent Berry approached Deborah Graham six or seven times about drugs and that she was justified in concluding that reporting Berry would accomplish little other than making an enemy of someone she would continue to have to work with. The Arbitrator characterized her position as a "damned-if-you-do-damned-if-you-don't" situation. The Arbitrator found that Ms. Graham sold Agent Berry four grams of marijuana for $30.00.

The Arbitrator determined that, although the employees had violated Rule 7(a), the Company was not justified in terminating their employment. In her conclusion, the Arbitrator explained that she was imposing heavy suspensions upon these three grievants in order to impress upon them the seriousness of their misconduct, but that in light of past disciplinary practice for similarly serious Mill Rule 7 violations, it was her determination that discharge was an excessively harsh punishment.

The Arbitrator rejected the Company's position that the plain meaning of the contract provides for immediate discharge in the instance of a violation of Mill Rule 7(a), Award at 19, and found that the Company's decision to terminate these employees was subject to arbitral review. The Arbitrator found that the contract did not unequivocally state that the conduct listed in Mill Rule 7(a) was *proper* cause for discharge as required by the Management Rights and Seniority Provisions. She rea-

soned that, while Rule 7 is entitled "Causes for Discharge," it does not say whether such cause *"will* be" or *"may* be" grounds for termination. She found that the explanatory sentences following the Rule 7 heading heightened, rather than clarified, the ambiguity of the title (e.g., violation of prescribed rules are cause for disciplinary action of varying degrees of severity," etc.). She further found that the Company's position was not supported by a reading of Mill Rule 7 in conjunction with Mill Rule 8. Mill Rule 8 states that certain violations, other than those listed in Rule 7, are "Causes for Discharge after Appropriate Warning." The Arbitrator found that Rule 8 simply *guaranteed* a warning before an employee could be terminated for violating its provisions. It did not make clear that a warning would never be the appropriate discipline under the contract for a violation of Rule 7.

The Arbitrator also found that the Company's Safety Policy handbook, albeit a unilateral statement of the Company, did not remove the ambiguity of the Agreement. The handbook states:

> ... violations of rules printed in red *may* mean immediate discharge. Violations of other rules may be cause for discharge after appropriate warning.

(Emphasis added.) Language tracking both Mill Rules 7(a) and 8(a), the latter of which, according to the Agreement, requires at least a warning prior to discharge, are printed in red.

Consequently, the Arbitrator concluded that Mill Rule 7 was ambiguous as to whether employees *must* be terminated and that it did not clearly state the agreement of the parties as to what constitutes proper cause for discharge. Since she found that the Rule was not an expression of the parties' agreement on what constituted proper cause, the Arbitrator determined that it was not an express exemption from the arbitral review process set out in the contract.[2]

---

2. The Arbitrator further determined that past practice and bargaining history also did not support the Company's position that the mean- ing of the agreement plainly mandated discharge, and that the Company had not given sufficient notice of a change in policy.

The Magistrate found that the Arbitrator's conclusion ignored the plain meaning of the Agreement and therefore recommended that this Court vacate the award. *See Hoteles Condado Beach, L.A. Concha and Convention Center v. Union de Tronquistas Local 901,* 763 F.2d 34, 41 (1st Cir.1985) *quoting Detroit Coil Company v. International Association of Machinists & Aerospace Workers, Lodge No. 82,* 594 F.2d 575, 579 (6th Cir.1979) (an arbitrator is without authority to disregard or modify plain and unambiguous provisions). The Magistrate determined that through the Management Rights clause of the Agreement the Company reserved the sole right to discharge employees for proper cause, and that Rule 7 unequivocally makes clear that a violation of its provisions, including subsection (a), is adequate cause for discharge, despite the use of differing language. In recommending vacation of the Arbitrator's award, the Magistrate rejected the union's reliance on *Super Tire Engineering Company v. Teamsters Local Union No. 676,* 721 F.2d 121 (3d Cir. 1983), and *Kewanee Machinery Division v. Teamsters Local 21,* 593 F.2d 314 (8th Cir. 1979), which tended to support the Union's position that the Company's decision to terminate these grievants was subject to arbitration.

After careful consideration the Court has determined that under the appropriate standard of review, as articulated by the United States Supreme Court, the First Circuit and other Circuit Courts of Appeal, this Court. cannot accept the Magistrate's Recommended Decision to vacate the Arbitrator's award.

The issue here is whether, once the Arbitrator determined that the grievants had violated Mill Rule 7(a), she had authority under the contract to review the Company's chosen disciplinary action. It is the Court's task to determine whether the Arbitrator's construction of the contract pro-

visions, and her resulting determination that the Company's penalty decisions are subject to arbitration, are contrary to the plain meaning of the contract.

The dispute resolution process in this Agreement covers "differences ... as to the meaning or application of the provisions of this Agreement." Thus, the scope of the arbitration clause is broadly defined. In the context of ordering an employer to arbitrate a dispute, the United States Supreme Court has made clear that exclusions from the arbitration process must be specific and unambiguous.

> An order to arbitrate ... should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage ... "[S]trictly a function of management" must be interpreted as referring only to that over which the contract gives management complete control and unfettered discretion.

*Warrior & Gulf,* 363 U.S. 582–83, 584, 80 S.Ct. 1353–54.

The Company argues that the parties have agreed, as evidenced by Mill Rule 7, that the conduct of the grievants in this case constitutes proper cause for discharge. The Union argues that the contract provides that such conduct *may* be proper cause. The Arbitrator resolved this conflict by concluding that Mill Rule 7 does not unambiguously require dismissal or reserve penalty decisions to the Company. *See supra* at 465–66. In her discussion of whether she had authority to reduce the Company's chosen penalty, the Arbitrator relied on her lengthy discussion of the ambiguity of the relevant contract provisions. She concluded that based on the ambiguity of Mill Rule 7, there was no express restriction in the Agreement limiting her authority under the arbitration clause. *Award* at 30.[3] Under these conditions, she stated "it

---

**3.** This finding is predicated on a determination that Mill Rule 7 does not *require* the Company to discharge an employee who violates its provisions. The Arbitrator made such a finding

based on her determination, *inter alia,* that the language of the Rule is ambiguous. *See supra* at 466. The same ambiguity which formed the basis for the Arbitrator's determination that the

is well established that ... [an arbitrator] has the authority to fashion a lesser penalty[.]" *Id.* This Court cannot say her reasoning was "so palpably faulty that no judge, or group of judges, could ever conceivably have made such a ruling." *Bettencourt,* 560 F.2d at 1050.

In fact, the Court of Appeals for the Eighth Circuit did reach similar results in *Kewanee* and *Super Tire.* Although the contract in *Super Tire* did not include the exact language of the "management rights" clause in this case, it did provide that the offense committed by the employee in that case would be "cause for dismissal." In *Kewanee,* in addition to construing a shop rule and a contract provision, the arbitrator in *Kewanee* construed "Management Rights" and "proper cause" provisions, both part of the contract, which were very similar to those presented in this case. The Eighth Circuit held that the arbitrator had authority to construe the Management Rights provision, reserving to the company the "sole right to ... discharge employees" as subject to arbitral determination of proper cause. In contrast, in *Mistletoe Express Service v. Motor Expressmen's Union,* 566 F.2d 692 (10th Cir.1977), relied on by the Company, the contract specifically states that the parties had agreed, prior to the fact, on what conduct constituted "just cause" for termination, exactly the term employed in describing the Company's rights under the contract.[4]

In the instant case, the Court cannot vacate the Arbitrator's award because it would construe "cause" as equivalent to "proper cause," but must enforce the award if the Arbitrator's determination that the contract does not require dismissal or remove this issue from her jurisdiction is conceivably correct. In light of the conflicting authority on this issue, the Court must find that it is at least that.

## II. Does the Award Violate Public Policy?

■ This Court accepts that portion of the Magistrate's recommendation (appended hereto as Exhibit "A") which concludes that the enforcement of this arbitration award does not violate public policy. In accepting the Recommended Decision, the Court also notes *Premium Building Products Company v. United Steelworkers of America, AFL–CIO,* 616 F.Supp. 512, 516 (N.D.Ohio 1985) (court cannot establish an across-the-board ruling that public policy requires that anyone caught smoking marijuana at their workplace is subject to discharge in all cases), which was issued a few days prior to *Misco, Inc. v. United Paperworkers International Union,* 768 F.2d 739 (5th Cir.1985). In addition, the Court notes the dissenting opinion in *Misco,* 768 F.2d at 743 (Tate, J.).

Accordingly, the Company's Motion to Vacate the Award of the Arbitrator is hereby DENIED.

So ORDERED.

## EXHIBIT A
## PUBLIC POLICY

If the district judge rejects the recommendation of the previous section that the arbitrator's interpretation of the contract is within her authority, such a conclusion would ordinarily end the matter and the

---

Rule does not require termination, provides the grounds for a finding that Rule 7 does not expressly remove a termination decision from arbitration.

4. The Court notes that in the context of determining the ambiguity *vel non* of the contract, the Arbitrator stated that the Company, by choosing to retain discretion over discipline, gave "a third party neutral the same discretion when reviewing the propriety of those decisions." Award at 20. This statement, taken alone, is not necessarily correct. An employer may specify in a collective bargaining agreement that it has discretion over the degree of punishment warranted by employee violations and that such decisions are not subject to arbitral review (unless arbitrary and capricious). *See, e.g., Mistletoe,* 566 F.2d 692. However, this sentence does not invalidate the rest of the Arbitrator's analysis regarding the ambiguity of the contract or her reasoning that if Mill Rule 7 does not expressly provide that possessing or selling marijuana on the job is proper cause for discharge, it is not an express exemption from arbitration of the Company's termination decision. *See* Award at 30.

arbitration award would be enforced. In a narrow class of cases, however, the courts have declined to enforce an arbitrator's interpretation of a contract because the contract as interpreted would be contrary to public policy. The United States Supreme Court has identified the standards for application of this narrow exception:

> If the contract as interpreted by [the arbitrator] violates some explicit public policy, we are obligated to refrain from enforcing it. Such a public policy, however, must be well defined and dominant, and is to be ascertained "by reference to the laws and legal precedents and not from general consideration of supposed public interests."

*W.R. Grace & Co.*, 461 U.S. at 766 [103 S.Ct. at 2183] (citations omitted). The Fifth Circuit Court of Appeals has applied this principle to deny enforcement of a contract interpreted by an arbitrator to require reinstatement of an over-the-road tractor-trailer driver who admitted drinking liquor on the job. *Amalgamated Meat Cutters v. Great Western Food Co.*, 712 F.2d 122 (5th Cir.1983). Federal Motor Carrier Safety Regulations explicitly prohibited the driver's conduct and required the employer to prevent it. This court, affirmed by the First Circuit Court of Appeals, declined to enforce a contract interpreted by an arbitrator to require reinstatement of a postal employee who admitted embezzling over $4,000 worth of money orders. *U.S. Postal Service v. American Postal Workers Union*, 736 F.2d 822 (1st Cir.1984). In that case, the First Circuit pointed to several federal statutes exemplifying a federal policy regulating the conduct of postal employees and protecting the public in its use of the postal service. In *Local 453 v. Otis Elevator Company*, 314 F.2d 25 (2d Cir.1963), on the other hand, the court enforced a contract interpreted by an arbitrator to require reinstatement of a company employee who had violated a company rule against gambling on the

premises and who was convicted of a misdemeanor. The court found that the public policy represented by the New York statutory prohibition was vindicated by the criminal conviction and further vindicated by a 7–month uncompensated layoff upheld by the arbitrator. The court found that no "greater vindication of the public condemnation of gambling" was required. 314 F.2d at 29.

The issue in these cases is most specifically *not* whether the court approves the employee's conduct or the arbitrator's remedy ordering reinstatement, but whether enforcing a contract between the parties that requires such reinstatement (for the arbitrator's decision is the binding interpretation of what the contract requires) violates an "explicit," "well defined and dominant" public policy exemplified by "laws and legal precedents." *W.R. Grace & Co., supra.* [9]

In that connection, Maine State law provides that possession of a "usable" amount of marijuana is a civil violation, subject to a fine of up to $200. 22 M.R.S.A. § 2383. Trafficking and furnishing, which in this case would amount to selling or giving away the marijuana, are Class D crimes, 17–A M.R.S.A. §§ 1103(2)(C), 1106(2)(B), subject to imprisonment for less than one year and a fine of up to $1,000, 17–A M.R.S.A. § 1252(2)(D), 1301(B). Under federal law, possession is a misdemeanor with a penalty of imprisonment of not longer than one year, a fine of $5,000 or both, 21 U.S.C. § 844(a). Sales are felonies with penalties of up to five years imprisonment, up to $50,000 in fines, or both, 21 U.S.C. § 841(b)(1)(C), but a first offender possessing or distributing a small amount may avoid an adjudication of guilt and obtain probation for not longer than one year, 21 U.S.C. §§ 841(b)(4), 844(b)(1).

Thus, state and federal law provides only light penalties in connection with possession, furnishing, or distributing a small

---

**9.** The Union attempts to have the court consider the conduct of the police undercover operation in its analysis of public policy. That conduct, however, plainly has no bearing on whether enforcement of the collective bargaining agreement, as interpreted by the Arbitrator, is contrary to public policy.

quantity of marijuana as is the case here. In Maine, possession is not even criminal, but a civil infraction. As a matter of federal law, if it is a first offense, an adjudication of guilt can be avoided. It is clear, moreover, that the policy of these statutes is directed to the public at large, not as in the *Amalgamated Meat Cutters* case to the specific category of over-the-road truckdrivers or as in the *U.S. Postal Service* case to the specific category of postal employees. Although the public policy of discouraging marijuana usage is clear, these statutes do not demonstrate a clear public policy preventing a company from agreeing with a union that it will discipline employees with lengthy periods of unpaid suspension but not outright dismissal if they violate a company rule on the subject.

I recognize that this conclusion is contrary to the decision reached recently by the Fifth Circuit Court of Appeals in *Misco, Inc. v. United Paperworkers International Union*, 768 F.2d 739 (5th Cir.1985).[10] There, the court declined to enforce an arbitration award interpreting the collective bargaining agreement to require reinstatement of an employee found in possession of marijuana and in the atmosphere of marijuana smoke in another person's car on the company lot. The court found the award to be "against well defined public policy—the Louisiana law against possession of marijuana and the public policy, embodied in the employer's rule, against introduction of drugs into the workplace and consequent operation of dangerous machinery by persons under their influence." 758 F.2d at 741. With all due respect to the Fifth Circuit's conclusion, I believe it fails to follow the standards set forth in *W.R. Grace, supra*. As stated in *Muschany v. United States*, 324 U.S. 49, 66 [65 S.Ct. 442, 451, 89 L.Ed. 744] (1945) (a case referred to in *W.R. Grace, supra* ), "[a]s the term 'public policy' is vague, there must be found definite indications in the law of the sovereignty to justify the invalidation of a contract as contrary to that policy." Thus, even though there may be a general state law against marijuana possession or usage, that does not demonstrate a well defined and dominant explicit public policy to prevent employers from agreeing that they will discipline their employees who violate that law in some way other than outright termination. *Misco's* description of the risks to workplace safety when the dangerous machinery involved in that case and this case is used by those under the influence of drugs or alcohol involves "general consideration of supposed public interest" rather than the explicit laws and legal precedents required by *W.R. Grace*. The parties here have not cited the court to any statutory or regulatory statements requiring termination of employees like these. Indeed, Rule 8 of the Agreement, which is not challenged here, clearly provides that the Company has explicitly agreed to give a warning to an employee who reports to duty *under the influence* of alcohol or narcotics rather than immediately terminate him or her. If a court's analysis of workplace safety is to govern the outcome, a court would have to be prepared to invalidate the explicit discipline provided by a rule like Rule 8 since an employee under the influence is far more imminently dangerous to workplace safety than the incidents here. Other caselaw from the Fifth Circuit has recognized that the duty or public policy of providing a safe workplace is not alone sufficient to justify a court in voiding a collective bargaining agreement as interpreted by an arbitrator. *Johns-Manville Corp. v. International Ass'n of Machinists*, 621 F.2d 756 (5th Cir.1980).

I, therefore, conclude that the contract as interpreted by the Arbitrator is not contrary to public policy.[11]

10. *Misco* failed even to cite the *W.R. Grace* decision and based its analysis solely upon that provision of *Amalgamated Meat Cutters* which dealt with the danger of the truckdriver's conduct rather than the specific laws which had been violated.

11. I would reject the Company's argument, Petition for Vacation of Award of Arbitration, ¶ 15, that the award must be vacated because "the Arbitrator refused to accept and consider relevant judicial precedent published after filing of post hearing briefs with the Arbitrator (and also

DATED at Portland, Maine, this 17th day of January, 1986.

/s/ D. Brock Hornby
D. Brock Hornby
United States Magistrate

refused to consider S.D. Warren's reply brief)...." The Arbitrator like a court, must be able to invoke cloture on proceedings so that she may issue a decision.

I have not addressed the argument whether the Arbitrator improperly declined to consider certain evidence or whether she properly interpreted the so-called *Greenlaw* award, a previous arbitral decision involving the Company and the Union.